# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 14, 2012          Decided June 12, 2012

No. 12-1077

MACK TRUCKS, INC. AND VOLVO GROUP NORTH AMERICA, LLC,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

NAVISTAR, INC.,
INTERVENOR

———

Consolidated with 12-1078, 12-1099

———

On Petitions for Review of a Final Rule of the
United States Environmental Protection Agency

———

*Christopher T. Handman* argued the cause for petitioners. With him on the briefs were *R. Latane Montague*, *Sean Marotta*, *Timothy K. Webster*, *Samuel I. Gutter*, *Karen K. Mongoven*, *Alec C. Zacaroli*, and *Julie R. Domike*.

*Michele L. Walter*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondent.

*Cary R. Perlman* and *Laurence H. Levine* were on the brief intervenor Navistar, Inc. in support of respondents.

Before: SENTELLE, *Chief Judge*, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: In January 2012, EPA promulgated an interim final rule (IFR) to permit manufacturers of heavy-duty diesel engines to pay nonconformance penalties (NCPs) in exchange for the right to sell noncompliant engines. EPA took this action without providing formal notice or an opportunity for comment, invoking the "good cause" exception provided in the Administrative Procedure Act (APA). Because we find that none of the statutory criteria for "good cause" are satisfied, we vacate the IFR.

I

In 2001, pursuant to Section 202 of the Clean Air Act ("the Act"), EPA enacted a rule requiring a 95 percent reduction in the emissions of nitrogen oxide from heavy-duty diesel engines. 66 Fed. Reg. 5,002 (Jan. 18, 2001). By delaying the effective date until 2010, EPA gave industry nine years to innovate the necessary new technologies. *Id.* at 5,010. (EPA and manufacturers refer to the rule as the "2010 NO$_x$ standard." 77 Fed. Reg. 4,678, 4,681 (Jan. 31, 2012).) During those nine years, most manufacturers of heavy-duty diesel engines, including Petitioners, invested hundreds of millions of dollars to develop a technology called "selective catalytic reduction." This technology converts nitrogen oxide into nitrogen and water by using a special aftertreatment system and a diesel-based chemical agent. With selective

catalytic reduction, manufacturers have managed to meet the 2010 $NO_x$ standard.

One manufacturer, Navistar, took a different approach. For its domestic sales, Navistar opted for a form of "exhaust gas recirculation," but this technology proved less successful; Navistar's engines do not meet the 2010 $NO_x$ standard. All else being equal, Navistar would therefore be unable to sell these engines in the United States—unless, of course, it adopted a different, compliant technology. But for the last few years, Navistar has been able to lawfully forestall that result and continue selling its noncompliant engines by using banked emission credits.[1] Simply put, it bet on finding a way to make exhaust gas recirculation a feasible and compliant technology before its finite supply of credits ran out.

Navistar's day of reckoning is fast approaching: its supply of credits is dwindling and its engines remain noncompliant. In October 2011, Navistar informed EPA that it would run out of credits sometime in 2012. EPA, estimating that Navistar "might have as little as three to four months" of available credits before it "would be forced to stop introducing its engines into commerce," leapt into action.[2] Resp't Br. at 2–3. Without formal notice and comment, EPA hurriedly promulgated the IFR on January 31, 2012, pursuant

---

[1] We have discussed EPA's emissions credits system more fully in *National Petrochemical & Refiners Association v. EPA*, 287 F.3d 1130, 1148 (D.C. Cir. 2002).

[2] At oral argument, EPA and counsel for Navistar indicated that now, seven months after it notified EPA of its credit shortage, Navistar still has and successfully uses credits to sell some noncompliant engines. Oral Arg. Recording at 32:35–33:15. Navistar also avails itself of the NCPs authorized by the IFR in other markets. Navistar, Inc.'s Motion for Leave to Intervene at 3 (Feb. 28, 2012) ["Navistar Motion"].

to its authority under 42 U.S.C. § 7525(g), to make NCPs available to Navistar.[3]

To issue NCPs under its regulations, EPA must first find that a new emissions standard is "more stringent" or "more difficult to achieve" than a prior standard, that "substantial work will be required to meet the standard for which the NCP is offered," and that "there is likely to be a technological laggard." 40 C.F.R. § 86.1103-87. EPA found these criteria were met. The 2010 $NO_x$ standard permits a significantly smaller amount of emissions than the prior standard, so the first criterion is easily satisfied. As for the second, EPA simply said that, because compliant engines (like Petitioners') use new technologies to be compliant, "[i]t is therefore logical to conclude . . . that substantial work was required to meet the emission standard." 77 Fed. Reg. at 4,681. Finally, EPA determined that there was likely to be a technological laggard because "an engine manufacturer [Navistar] . . . has not yet met the requirements for technological reasons" and because "it is a reasonable possibility that this manufacturer may not be able to comply for technological reasons." *Id.*

Having determined that NCPs are appropriate, EPA proceeded to set the amount of the penalty and establish the "upper limit" of emissions permitted even by a penalty-paying manufacturer. The IFR provides that manufacturers may sell heavy-duty diesel engines in model years 2012 and 2013 as long as they pay a penalty of $1,919 per engine and as long as

---

[3] The NCP is theoretically available to any heavy-duty diesel engine manufacturer, but by discussing only Navistar's predicament in its brief and in the IFR, EPA all but concedes that it issued the IFR for solely Navistar's benefit. *See* Resp't Br. at 11–13; 77 Fed. Reg. at 4,681. Navistar similarly averred in its motion to intervene that "there is no doubt that the engine manufacturer described in EPA's Interim Final Rule is Navistar." Navistar Motion, at 3.

the engines emit fewer than 0.50 grams of nitrogen oxide per horsepower-hour. *Id.* at 4,682–83. This "upper limit" thus permits emissions of up to two-and-a-half times the 0.20 grams permitted under the 2010 $NO_x$ standard with which Navistar is meant to comply and with which Petitioners do comply. *See id.* at 4,681.

EPA explained its decision to forego notice and comment procedures by invoking the "good cause" exception of the APA, *id.* at 4,680, which provides that an agency may dispense with formal notice and comment procedures if the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B). EPA cited four factors to show the existence of good cause: (1) notice and comment would mean "the possibility of an engine manufacturer [Navistar] . . . being unable to certify a complete product line of engines for model year 2012 and/or 2013," (2) EPA was only "amending limited provisions in existing NCP regulations," (3) the IFR's "duration is limited," and (4) "there is no risk to the public interest in allowing manufacturers to certify using NCPs before the point at which EPA could make them available through a full notice-and-comment rulemaking." 77 Fed. Reg. at 4,680.

Petitioners each requested administrative stays of the IFR, protesting that EPA lacked good cause within the meaning of the APA. Petitioners also objected to the substance of the NCP, arguing that EPA misapplied its own regulatory criteria for determining when such a penalty is warranted, and that EPA arbitrarily and capriciously set the amount of the penalty and the "upper limit" level of permissible emissions. EPA denied those requests. Petitioners promptly filed an emergency motion with this Court to expedite review, which we granted.

6

II

Navistar, which has intervened on behalf of EPA, claims Petitioners lack standing to challenge the IFR.  EPA does not make such a claim but, of course, we have the independent "obligation to satisfy [ourselves]" of our own jurisdiction before proceeding to the merits.  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012).

Navistar's sole argument is that Petitioners' lack procedural standing.  We have no need to reach this question, however, since Petitioners clearly have standing as direct competitors of Navistar: they allege the IFR "authorizes allegedly illegal transactions that have the clear and immediate potential to compete with [their] own sales." *Sherley v. Sebelius*, 610 F.3d 69, 72–73 (D.C. Cir. 2010). Navistar admits it is using NCPs to sell competitive engines, *see* Navistar Motion, at 3, so this injury is anything but conjectural.  Petitioners' injury is also "clear[ly]" traceable to the IFR which authorizes that allegedly illegal competition, and is redressable by a vacatur of the IFR.  *Sherley*, 610 F.3d at 72.  Finally, because "NCP provisions mandate that penalties . . . remove any competitive disadvantage to manufacturers whose engines or vehicles achieve the required degree of emission reduction," Petitioners' "interest in avoiding anticompetitive injury plainly falls within the zone of interests Congress sought to protect." *Nat'l Petrochem. & Refiners Ass'n*, 287 F.3d at 1148.  Even Navistar does not suggest otherwise in its brief.

We therefore proceed to the merits.

## III

Petitioners argue first that Section 206 of the Act requires notice and comment; alternatively, they claim EPA lacked good cause in any event.  The APA provides that, "[e]xcept when notice or hearing is required by statute," an agency is relieved of its obligation to provide notice and an opportunity to comment "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).[4]

---

[4] The APA provides a second exception to the notice-and-comment requirement: the requirement is lifted when "persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law."  5 U.S.C. § 553(b).  Navistar, and only Navistar, argues that Petitioners had such actual notice of the IFR, but Petitioners knew only that EPA was gathering information for a possible NCP and merely orally supplied some information they thought might be relevant to setting the levels of the penalty and upper limit.  EPA did not provide a draft of the IFR, did not advise Petitioners of the levels, did not explain or discuss its methodology, and did not ask Petitioners to discuss whether NCPs were justified in the first place.  Jorgensen Aff. ¶ 15; Kayes Aff. ¶¶ 12–17; Greszler Aff. ¶¶ 11–13.  In fact, according to Petitioners' affidavits, EPA suggested the information was being gathered to develop a proposal which would in turn be subject to ordinary notice and comment—not that this was the end of the road.  *E.g.*, Greszler Aff. ¶ 13.  EPA has not argued to the contrary before this Court, and Navistar offers no support for its position that such scant and misleading notice is sufficient.  It certainly pales in comparison to what the APA requires of formal notice.  *See* 5 U.S.C. § 553(b)(3) (notice shall include "the terms or substance of the proposed rule or a description of the subjects and issues involved"); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983) ("Agency notice must

8

A

Is notice or hearing expressly required by statute? Section 206(g)(1) of the Act, 42 U.S.C. § 7525(g)(1), says that NCPs shall be provided "under regulations promulgated by the Administrator after notice and opportunity for public hearing." According to Petitioners, this is an express requirement of notice and comment that bars EPA from even invoking the good cause exception in this case. Read alone, this language seems to support their argument. But we cannot read one subsection in isolation. *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The rest of Section 206(g) clearly reveals, as EPA points out, that this requirement applies *only* to the very first NCP rule—which set out the regulatory criteria governing future NCPs—not for each and every NCP subsequently promulgated. Because EPA's position is clearly correct, we have no need to invoke any rule of deference. *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984).

Subsection (g)(2), the very next paragraph, says that "no [NCP] may be issued under paragraph (1) . . . if the degree by which the manufacturer fails to meet any standard . . . exceeds the percentage determined under regulations promulgated by the Administrator to be practicable. *Such regulations* . . . shall be promulgated not later than one year after August 7, 1977." 42 U.S.C. § 7525(g)(2) (emphasis added). The regulations to which subsection (g)(2) refers are clearly the regulations promulgated under subsection (g)(1). Subsection (g)(2) explains they are of a guiding nature and, importantly,

---

describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking."). It would be wholly illogical to require any less from actual notice.

that they must be issued by certain a date in 1977. This language cannot possibly be read to describe each and every NCP. Petitioners' interpretation of subsection (g)(1), suggesting that it does refer to every NCP, would render subsection (g)(2) not just superfluous, but impossible—a result we must avoid. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1108 (D.C. Cir. 1979). Subsection (g)(3) makes the flaw in Petitioners' interpretation even clearer: "The regulations promulgated under paragraph (1) shall, not later than one year after August 7, 1977, provide for nonconformance penalties in amounts determined under a formula established by the Administrator." 42 U.S.C. § 7525(g)(3). Once again, this provision and its deadline reveal that subsection (g)(1) refers to a one-time promulgation of a formula that governs future penalty applications. Reading Section 206(g) as a whole, it is clear nothing in that provision requires EPA to provide notice and comment every time it applies the original formula to the establishment of specific penalties.

Contrary to Petitioners' fears, the Act's lack of a notice and comment requirement does not mean that *no* procedures are statutorily required when NCPs are issued. The APA's general rule requiring notice and comment—absent identified exceptions—still obviously applies. Indeed, EPA has always argued that the IFR is justified under the good cause exception, not that it is justified because notice and comment is never required. *See* 77 Fed. Reg. at 4,680.

B

Because the Act does not contain any notice-and-comment requirement applicable to the IFR, EPA may invoke the APA's good cause exception. We must therefore determine whether notice and comment were "impracticable,

unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). On that question, it would appear we owe EPA's findings no particular deference. *See Jifry v. FAA*, 370 F.3d 1174, 1178–79 (D.C. Cir. 2004) (finding good cause without resorting to deference); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (finding no good cause without invoking deference). But we need not decide the standard of review since, even if we were to review EPA's assertion of "good cause" simply to determine if it is arbitrary or capricious, 5 U.S.C. § 706(2)(A), we would still find it lacking.

We have repeatedly made clear that the good cause exception "is to be narrowly construed and only reluctantly countenanced." *Util. Solid Waste Activities Grp.*, 236 F.3d at 754; *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992); *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *see also Jifry*, 370 F.3d at 1179 ("The exception excuses notice and comment in emergency situations, or where delay could result in serious harm."); *Am. Fed. of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("As the legislative history of the APA makes clear, moreover, the exceptions at issue here are not 'escape clauses' that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations . . . .").

First, an agency may invoke the impracticability of notice and comment. 5 U.S.C. § 553(b)(B). Our inquiry into impracticability "is inevitably fact- or context-dependent," *Mid-Tex Electric Coop. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). For the sake of comparison, we have suggested agency action could be sustained on this basis if, for example, air travel security agencies would be unable to address threats posing "a possible imminent hazard to aircraft, persons, and

property within the United States," *Jifry*, 370 F.3d at 1179, or if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.*, 236 F.3d at 755 (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981) (describing that circumstance as "a special, possibly unique, case").

By contrast, the context of this case reveals that the only purpose of the IFR is, as Petitioners put it, "to rescue a lone manufacturer from the folly of its own choices." Pet. Br. at 29; *see* 77 Fed. Reg. at 4,680 (expressing EPA's concern that providing notice and comment would mean "the possibility of an engine manufacturer [Navistar] . . . being unable to certify a complete product line of engines for model year 2012 and/or 2013"). The IFR does not stave off any imminent threat to the environment or safety or national security. It does not remedy any real emergency at all, save the "emergency" facing Navistar's bottom line. Indeed, all EPA points to is "the serious harm to Navistar and its employees" and "the ripple effect on its customers and suppliers," Resp't Br. at 28, but the same could be said for any manufacturer facing a standard with which its product does not comply.

EPA claims the harm to Navistar and the resulting up- and down-stream impacts should still be enough under our precedents. The only case on which it relies, however, is one in which an entire industry and its customers were imperiled. *See Am. Fed. of Gov't Emps.*, 655 F.2d at 1157. Navistar's plight is not even remotely close to such a weighty, systemic interest, especially since it is a consequence brought about by Navistar's own choice to continue to pursue a technology which, so far, is noncompliant. At bottom, EPA's approach

would give agencies "good cause" under the APA every time a manufacturer in a regulated field felt a new regulation imposed some degree of economic hardship, even if the company could have avoided that hardship had it made different business choices.  This is both nonsensical and in direct tension with our longstanding position that the exception should be "narrowly construed and only reluctantly countenanced."  *Util. Solid Waste Activities Grp.*, 236 F.3d at 754.

Second, an agency may claim notice and comment were "unnecessary."  5 U.S.C. § 553(b)(B).  This prong of the good cause inquiry is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public."  *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.  This case does not present such a situation.  Just as in *Utility Solid Waste*, the IFR is a rule "about which these members of the public [the petitioners] were greatly interested," so notice and comment were not "unnecessary." *Id.*  EPA argues that since the IFR is just an interim rule, good cause is satisfied because "the interim status of the challenged rule is a significant factor" in determining whether notice and comment are unnecessary.  Resp't Br. at 35; 77 Fed. Reg. at 4,680 (finding good cause because the IFR's "duration is limited").  But we held, in the very case on which EPA relies, that "the limited nature of the rule cannot in itself justify a failure to follow notice and comment procedures."  *Mid-Tex Electric Coop.*, 822 F.2d at 1132.  And for good reason: if a rule's interim nature were enough to satisfy the element of good cause, then "agencies could issue interim rules of limited effect for any plausible reason, irrespective of the degree of urgency" and "the good cause exception would soon swallow the notice and comment rule."  *Tenn. Gas Pipeline*, 969 F.2d at 1145.

13

EPA's remaining argument that notice and comment were "unnecessary" is that the IFR was essentially ministerial: EPA simply input numbers into an NCP-setting formula without substantially amending the NCP regime. Resp't Br. at 36; 77 Fed. Reg. at 4,680. But even if it were true that EPA arrived at the level of the penalty and the upper limit in this way (and Petitioners strenuously argue that EPA actually *amended* the NCP regime in order to arrive at the upper limit level in the IFR[5]), that argument does not account for how EPA determined NCPs were warranted in this case in the first place—another finding to which Petitioners object. EPA's decision to implement an NCP, perhaps even more than the level of the penalty itself, is far from inconsequential or routine, and EPA does not even attempt to defend it as such.

Finally, an agency may invoke the good cause exception if providing notice and comment would be contrary to the public interest. 5 U.S.C. § 553(b)(B). In the IFR, EPA says it has good cause since "there is no risk to the public interest in allowing manufacturers to [use] NCPs before the point at which EPA could make them available through a full notice-and-comment rulemaking," 77 Fed. Reg. at 4,680, but this misstates the statutory criterion. The question is not whether *dispensing* with notice and comment would be contrary to the public interest, but whether *providing* notice and comment would be contrary to the public interest. By improperly framing the question in this way, the IFR inverts the presumption, apparently suggesting that notice and comment is usually unnecessary. We cannot permit this subtle malformation of the APA. The public interest prong of the

---

[5] EPA admits in its brief that "Petitioners are correct that in past rules, EPA based the penalty rates [on certain factors]" and that "that was not the case for the Interim Rule." Resp't. Br. at 52.

good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest. It is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Util. Solid Waste Activities Grp.*, 236 F.3d at 755. In such a circumstance, notice and comment could be dispensed with "in order to prevent the amended rule from being evaded." *Id.* In its brief, EPA belatedly frames the inquiry correctly, but goes on to offer nothing more than a recapitulation of the harm to Navistar and the associated "ripple effects." Resp't Br. at 38. To the extent this is an argument not preserved by EPA in the IFR, we cannot consider it, *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), but regardless, it is nothing more than a reincarnation of the impracticability argument we have already rejected.

IV

Because EPA lacked good cause to dispense with required notice and comment procedures, we conclude the IFR must be vacated without reaching Petitioners' alternative arguments. We are aware EPA is currently in the process of promulgating a final rule—with the benefit of notice and comment—on this precise issue. However, we strongly reject EPA's claim that the challenged errors are harmless simply because of the pendency of a properly-noticed final rule. Were that true, agencies would have no use for the APA when promulgating any interim rules. So long as the agency eventually opened a final rule for comment, every error in every interim rule—no matter how egregious—could be excused as a harmless error.

We do recognize the pending final rule means our vacatur of the IFR on these procedural grounds will be of limited practical impact. Before the ink is dry on that final rule, we offer two observations about the parameters of this rulemaking. First, NCPs are meant to be a temporary bridge to compliance for manufacturers that have "made every effort to comply." *United States v. Caterpillar, Inc.*, 227 F. Supp. 2d 73, 88 (D.D.C. 2002). As EPA itself has explained, NCPs are not designed to bail out manufacturers that voluntarily choose, for whatever reason, not to adopt an existing, compliant technology. *See* 77 Fed. Reg. 4,736, 4,739 (Jan. 31, 2012) ("NCPs have always been intended for manufacturers that cannot meet an emission standard for technological reasons rather than manufacturers choosing not to comply."); 50 Fed. Reg. 35,402, 35,403 (Aug. 30, 1985) (stating that NCPs are inappropriate "if many manufacturers' vehicles/engines were already meeting the revised standard or could do so with relatively minor calibration changes or modifications"). Based solely on what EPA has offered in the IFR, it at least appears to us that NCPs are likely inappropriate in this case.

Second, we emphasize that "no legislation pursues its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987), especially when Congress explicitly says as much in the legislation. Though the Clean Air Act requires EPA to issue NCPs when it determines the necessary criteria are satisfied, it also expressly demands that EPA "remove any competitive disadvantage to manufacturers whose engines or vehicles achieve the required degree of emission reduction." 42 U.S.C. § 7525(g)(3)(E). As it is presented in the IFR, we are highly skeptical that the penalty and upper limit provided for in this NCP satisfy this congressional demand to protect compliant manufacturers.

That being said, EPA is certainly free to make whatever findings it deems appropriate in the pending final rulemaking—subject, of course, to this Court's review. For now, therefore, we simply hold that EPA lacked good cause for not providing formal notice-and-comment rulemaking, and accordingly vacate the IFR and remand for further proceedings.

*So ordered.*